IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES F., by and through his next | § | |
| friends, CHRISTINE F. and MICHAEL F., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:23-cv-02063 |
| | § | |
| CLEAR CREEK INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.BACKGROUND FACTS............................................................................................... 1

    A.  The CVI Report by Ms. Zauner-Undesser ........................................................ 2

    B.  Impact of the CVI Report on Analysis of Issues with Reading and Spelling .......... 7

    C. CCISD's Flawed Evaluation of CVI in 2020.................................................... 8

    D.  Lynne Bach's Uninformed Review of Evaluations and Input at ARD Meeting ........ 10

    E.  CCISD's Orientation and Mobility Assessment .............................................. 15

    F.  Plaintiff's Special Education Teacher .......................................................... 17

    G. The Administrative Due Process Hearing ..................................................... 19

II.ARGUMENT .............................................................................................................. 19

    A. Standard of Review ................................................................................... 19

    B. Defendant's Obligation to Provide a Free Appropriate Public Education ............. 20

    C. CCISD Failed to Individualize Plaintiff's Program Appropriately on the Basis of His Assessment and Performance.......................................................................... 22

    D.CCISD Failed to Apply the Principles Underlying the IDEA's Least Restrictive Environment Requirement Appropriately.............................................................. 27

    E. CCISD Failed to Provide Services in a Coordinated and Collaborative Manner. ........ 28

    F.  CCISD Failed to Provide Petitioner with an IEP Appropriately Designed to Provide Positive Academic and Non-Academic Benefits ......................................... 28

    G. Plaintiff Requires as a Remedy that CCISD Develop and Implement an Appropriate IEP and Contract with a CVI  Mentor for this Purpose. ................................... 30

    III. CONCLUSION .......................................................................................... 31

# TABLE OF AUTHORITIES

**CASES**

*Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*,
328 F.3d 804 (5th Cir. 2003)………………………………………………………………19, 20

*D.C. v. Klein Indep. Sch. Dist.*,
860 Fed. Appx. 894 (5th Cir. 2021)………………………………………………………...22

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
580 U.S 386 (2017)………………………………………………………………………20, 28

*E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*,
909 F.3d 754 (5th Cir. 2018)………………………………………………………………..22

*Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*,
582 F.3d 576 (5th Cir. 2009)……………………………………………………………..…22

*M.W. v. Rankin County Pub. Sch. Dist.*,
2022 U.S. Dist. LEXIS 21914 (N.D. Miss. Jan. 5, 2022)…………………………………….20

*Ojai Unified Sch. Dist. v. Jackson*,
4 F.3d 1467 (9th Cir. 1993)………………………………………………………………...25

*P.P. v. Northwest Indep. Sch. Dist.*,
839 Fed. Appx. 848 (5th Cir. 2020)………………………………………………………..24

*Richardson Independent School Dist. v. Michael Z.*,
580 F.3d 286 (5th Cir. 2009)……………………………………………………………….20

*Teague Indep. Sch. Dist. v. Todd L.*,
999 F.2d 127 (5th Cir. 1993)……………………………………………………....19, 20

*Z.B. v. D.C.*, 888 F.3d 515 (D.C. Cir. 2018)……………………………………………..28

**STATUTES AND REGULATIONS**

20 U.S.C. § 1412(a)(1)(A)…………………………………………………………………20

20 U.S.C. § 1412(a)(5)(A)…………………………………………………………………27

Plaintiff James F., by and through his next friends, Christine F. and Michael F., hereby submits his Plaintiff's Motion for Judgment on the Administrative Record and would respectfully show the Court as follows:

## I.    BACKGROUND FACTS

Plaintiff James F. is a ten-year old student[1] who receives instruction and services from the Clear Creek Independent School District ("CCISD") at the Brookwood Elementary School. *See, e.g.*, AR 3, 366.  CCISD deems him eligible for special education as a student with a Specific Learning Disability and Other Health Impairment.  AR 3, 366-7.  CCISD recognizes his Specific Learning Disability category as Reading Fluency.  AR 3, 367.  It recognizes his Other Health Impairment categories as ADHD, BVD (Binocular Vision Dysfunction), CIRS (Chronic Inflammatory Response Syndrome), and CVI (Cortical Visual Impairment).  AR 3, 367.

Cortical Visual Impairment ("CVI") is a "brain-based visual impairment involving the neural pathways and/or the brain."  AR 5, 637, 3362.  Specifically, it involves "vision loss that is caused by damage to the pathways between the eye and the brain and the specific parts of the brain responsible for vision resulting in visual perception difficulties and often auditory processing concerns."  AR 631.  CVI "is an invisible condition that exhibits distinct visual behaviors which are often misinterpreted by the educational school setting."  AR 637, 3362.  "Students with CVI have fluctuating visual performances depending on the physical environment, time of day, complexity of the task, competing sensory input, as well as internal stress, and fatigue."  AR 637, 3362.  These fluctuating visual performances "caus[e] many misconceptions regarding the causes of their atypical behaviors."  AR 637, 3362.

---

[1] Plaintiff provides his account of the background facts as of the date of the hearing.  He is twelve years old now.

While CCISD recognizes that Plaintiff has CVI, as noted above, it has consistently perpetuated the misconceptions surrounding that condition by taking the position that his CVI has no educational impact in the school setting. *See, e.g.*, AR 418. CCISD appears to have adopted this position at least in part because Plaintiff is a highly intelligent student who is, in fact, currently in the Gifted and Talented program at the school and thus performing better than his typically developing peers in many areas. *See, e.g.*, AR 3952. However, as discussed below, despite his many gifts and talents, Plaintiff has specific educational needs related to his CVI that CCISD has left unaddressed, in part because it has failed to assess them appropriately. Because CVI impacts all aspects of a child's education, leaving its impact unaddressed necessarily has a negative effect on all educational areas, including both the academic and non-academic spheres. For example, Plaintiff has continued to struggle with reading, spelling, and handwriting. While CCISD has worked with him on dyslexia and the like, its inadequate grasp of his CVI vitiates these efforts. Moreover, as further discussed below, Plaintiff has experienced significant frustrations that impact his behaviors in the school environment.

## A.  The CVI Report by Ms. Zauner-Undesser

Plaintiff's CVI expert, Samantha Zauner-Undesser, is a teacher of the visually impaired and a learning behavioral specialist in Illinois and also has a private company through which she tutors the families of children with CVI. AR 623, 3340-1, 3345. She has two bachelor's degrees, one for teaching the visually impaired and low vision, as well as one for a learning behavior specialist degree, which allows for instruction of students with behavioral disturbances, learning disabilities, and other special needs. AR 623, 3341-3. She also has an early childhood endorsement, a vision coordinator degree, a Master's degree in elementary education, and a Master's certificate in Developmental Therapist of Vision. AR 623, 3341-3. Her Administrative Endorsement allows her to serve as a vision coordinator or lead teacher of the visually impaired.

AR 623, 3343.  She has a Perkins[2] CVI Range endorsement, which entailed going through a program and conducting multiple CVI ranges graded against Dr. Christine Roman[3] to determine if the work meets her standards.  AR 623, 3343-4.  Ms. Zauner-Undesser attends and makes presentations at CVI conferences around the country.  AR 623, 3345-6.  In her ten years of teaching the visually impaired, she has always had at least two students with CVI.  AR 3346.  She was secretary and is now a member-at-large of the Neurological Impairment division for the national Association for the Education and Rehabilitation of the Blind and Visually Impaired, the division that focus on disseminating information about CVI.  AR 3346-7.

Plaintiff's mother hired Ms. Zauner-Undesser to conduct a CVI Range Assessment and Functional Vision Evaluation and Learning Media Assessment for Plaintiff.  AR 3349-50.  A CVI Range Assessment is a tool used to assess where a child falls on the spectrum of CVI for the purpose of determining "appropriate strategies and accommodations to allow the child to have educational access."  AR 3344.  To obtain a CVI Range, the examiner must do two assessments, a rating I and a rating II, which check for skills and characteristics.  AR 3362-3.  Ms. Zauner-Undesser did such assessments for Plaintiff.  AR 637-643, 3362-84.  She continued on as a private tutor and normally works with Plaintiff every week.  AR 3414.

On November 17, 2021, Ms. Zauner-Undesser completed her Functional Vision Evaluation, CVI evaluation, and Learning Media Evaluation for Plaintiff (collectively, the "CVI Report").  AR 631-71, 3350-1.  She stands by the CVI Report as an accurate encapsulation of Plaintiff's status at the time it was completed and she still sees the visual behaviors discussed

---

[2] Perkins is a leading school for the visually impaired.  AR 3344.
[3] Dr. Roman (also referred to as Dr. Roman-Lantzy) is one of the forerunners in the field of CVI and created the CVI Range Assessment.  AR 3344.

there during her work with Plaintiff now.  AR 3351.[4]  She based the conclusions in the CVI
Report in part on observations taken over several days at various times of day in different
settings.  AR 631-2, 3351-3.  It is critical to observe a child with CVI at various times of day and
across various settings because visual fatigue levels will vary as well as other factors.  AR 3352-
3.  Ms. Zauner-Undesser interviewed Plaintiff's mother as part of her work on the CVI Report.
AR 632-3, 3353-4.  Such an interview helps to identify areas of particular focus, but does not
change testing conclusions or outcomes.  AR 3353-4.

Ms. Zauner-Undesser calculated Plaintiff's CVI Range using a CVI Range Worksheet,
designed to reflect both the Rating I and the Rating II assessments.  AR 693-8, 3375-81.  She
determined that Plaintiff scored a 7 on Rating I and a 7.5 on Rating II, placing him at the
beginning stages of Phase III of CVI, which encompasses scores ranging from 7-10 on the scale.
AR 642, 3370-1, 3373.  At Phase III, the child with CVI gradually learns new strategies to have
more typical vision.  AR 3371-2.   Although functional vision can improve in a child with CVI,
the CVI is never resolved in the sense of no longer having an impact on the child.  AR 3371-2.

As part of her observations and assessments, Ms. Zauner-Undesser saw Plaintiff
displaying a variety of behaviors characteristic of children with CVI, including difficulties with
facial recognition—a characteristic also noted in interviews with parents and private providers.
AR 634, 639-40, 3354-5, 3369.  *See also* AR 640-1 (noting Plaintiff's strategy of locating his
mother by saying something to elicit a verbal response).  He could not identify the eye color or

---

[4] The administrative Hearing Officer below noted that Ms. Zauner-Undesser did not review the
school district's evaluation and documentation.  AR 10.  However, the expert expressly testified
that she did not want extraneous information at the time of drafting her initial report because she
wanted to base it entirely on her observations without bias.  AR 3441, 3454.  She has observed
Plaintiff many times since completing the report and has reviewed the school district
documentation without changing her opinions.  AR 3454-6.

various other facial features of family members.  AR 3355.  Such difficulties can give rise to safety concerns.  AR 3355.

Ms. Zauner-Undesser also observed Plaintiff beginning to display CVI-related frustrations, known as a CVI meltdown, due to the visual complexity of a scanning task he was asked to perform.  AR 634-5, 3355-6.  Initially, rather than admitting his frustrations, Plaintiff feigned boredom and tried to engage the examiner in off-topic discussion to distract from the difficulties he was experiencing—a common tactic when visual complexity becomes too pronounced—and to garner himself more time to complete the task at hand.  AR 634, 640, 3356-7, 3360-1, 3369.  For Plaintiff, a CVI meltdown will often look like task refusal, delaying an activity, and the like.  AR 634-5, 3361, 3406-8.  Ms. Zauner-Undesser is particularly qualified to assess such behaviors and their connection to CVI in light of her combination of a learning behavior specialist degree, a teacher of the visually impaired degree, and her elementary education degree.  AR 3404.

In other areas, Plaintiff showed substantial abilities, but also took steps to make his own environment more accessible to him.  For example, Ms. Zauner-Undesser observed Plaintiff's ability to track while reading, but observed him moving his body away slightly from visual complexity and moving objects around to reduce visual complexity.  AR 635, 3361.  Plaintiff thus tended to move his work to the left side.  AR 637, 3364.  He passed the color identification test, but he took more time to do so.  AR 635, 3361-2.

Plaintiff demonstrates other CVI characteristics as well.  For example, he demonstrates a visual field neglect, particularly in unfamiliar or complex environments, such as in a community setting.  AR 637-8, 3363-7.  In fact, he almost got hit by a car in the community setting due to such left-side visual field neglect.  AR 3365-7.  Plaintiff also uses movement to locate objects

and, occasionally, to elicit his visual attention. AR 638, 3367. He also appears to prefer certain colors (green and blue). AR 638, 3367-8. Plaintiff has significantly more challenges in visually complex environments as well. AR 639, 3368-9.

As part of her CVI Report, Ms. Zauner-Undesser also administered a Dutton Survey, involving interviewing Plaintiff's mother about Plaintiff's condition, as a tool to supplement and provide a checking mechanism to test the findings of the CVI Range Assessments. AR 637, 3363. If the CVI Range Assessments reveal an issue that the parents have not noticed, as reflected in the Dutton Survey, the reason is generally that the parents are not knowledgeable with respect to CVI. AR 3369. If the parents note something on the Dutton Survey that the CVI Range Assessments did not reveal, the examiner has the opportunity to focus in more closely on that issue and to assess it further as appropriate. AR 3364-5, 3403. In areas identified in the Dutton Survey as challenging, Ms. Zauner-Undesser sought to observe the issue herself to make her own determinations. AR 640-2, 3369-70. Rather than revealing any conflicts between the expert's testing and the information provided by the parent, the Dutton Survey confirmed the findings of the CVI Range Assessments and Ms. Zauner-Undesser's own observations. AR 3370.

Ms. Zauner-Undesser concluded that Plaintiff's CVI impacted him functionally across all settings, such that he needed a teacher of the visually impaired in the school district to address his CVI needs across the school day, as well as instruction in self-advocacy and accommodations to support his executive functioning and his interaction with peers, as well as other supports and services. AR 649-53, 3374. Ms. Zauner-Undesser had no difficulty concluding that CVI has an

educational impact on Plaintiff in his school environment.  AR 649-53, 3375.[5]  CVI does not go

away in any setting or in any part of the day, and Ms. Zauner-Undesser's observations and

testing of Plaintiff showed that CVI was very apparent.  AR 3375, 3455-7.  In fact, typically

visual access for a child with CVI is better in the home environment than in the school

environment.  AR 3400.  Ms. Zauner-Undesser explained that, without addressing the CVI,

Plaintiff would not have visual access to all his work and would not have his needs met and the

appropriate support and accommodations.  AR 3375.  Her continued observations of Plaintiff

throughout her tutoring sessions up to the present confirm her earlier recommendations and

conclusions.  AR 3414-5, 3454.

Ms. Zauner-Undesser also deemed it critical that CCISD instruct Plaintiff in self-

advocacy skills.  AR 3408-9.  Plaintiff must learn to understand the nature of his visual

impairment and communicate his needs relative to that impairment, so that he can access his

environment and help others understand his needs.  AR 3408-9, 3461-2.  Failure to address these

issues can result in depression and loss of emotional well-being.  AR 3409.

## B.    Impact of the CVI Report on Analysis of Issues with Reading and Spelling

Plaintiff's expert Mary Decker is an expert on special education specializing in the

instruction of students with dyslexia.  AR 625-9, 3474-5.  Her testing of Plaintiff showed some

progress in reading, and a leveling off in spelling.  AR 3479-80.  *See also* AR 3494-6 (explaining

that she also saw that he had not made progress in spelling when she reviewed school documents

and assessments).  Ms. Decker has no background in CVI herself, but reviewed Ms. Zauner-

---

[5] Ms. Zauner-Undesser sought to observe Plaintiff in his educational environment in the spring of 2022.  AR 1406, 3413-4.  However, CCISD offered her only brief segments of time that were insufficient for her to observe full lessons and significant blocks of time.  AR 1406, 3413-4.  By even offering such brief segments, CCISD thus demonstrated its failure to understand the requirements of appropriate CVI observation and assessment.  AR 3463-4.

Undesser's CVI Report. AR 3480-1. Her review of the CVI Report was eye-opening to her and caused her to understand better many behaviors she had observed in Plaintiff over the course of her testing. AR 3481-3. She believes that information concerning Plaintiff's CVI would impact the way she would carry out dyslexia instruction for him because, for example, she might need to modify the traditional multisensory approach and to restructure her lessons to emphasize core elements in a way that would maximize the use of his available attention and focus. AR 3483-5, 3496-7. *See also* AR 3691.

## C.    CCISD's Flawed Evaluation of CVI in 2020

In marked contrast to Ms. Zauner-Undesser's CVI Report, the CCISD evaluation of Plaintiff in December 2020 performed by Laura Coughlin (the "Coughlin Evaluation") placed him in a scoring range of 9-10 on the CVI rating scale. AR 506-7. Ms. Coughlin had only administered a CVI Range Assessment five times previously and once since and none of them were of a child at Phase III of CVI. AR 3850-1.

The assessment was performed improperly. As an initial matter, Ms. Coughlin derived her scoring range for Plaintiff from a "CVI Range Assessment Scoring Guide," which does not constitute the CVI Range Assessment itself. AR 506-7, 2081-6, 3381-3, 3862-3. Rather, it provides some initial training information and some examples to get someone started on how to do a CVI Range Assessment. AR 3382-4. Ms. Zauner-Undesser—Plaintiff's expert—would not use this set of pages in conducting a CVI Range Assessment. AR 3383-4. When Ms. Zauner-Undesser reviewed the final Coughlin Evaluation (AR 506-7), she could not tell from what source or sources the information derived and where the actual CVI Range Assessment might be. AR 3385-6, 3403-4. Ms. Coughlin has used some portion of the "CVI Range Assessment Scoring Guide" in her other six CVI assessments as well. AR 3852-5. However, she had also used a CVI Range Worksheet similar to Ms. Zauner-Undesser's worksheet (AR

693-8) on four of the five CVI assessments she had performed before Plaintiff's and five of the six others she has done total, but inexplicably did not use it in her assessment of Plaintiff.  AR 3866-7.  Upon review of Ms. Coughlin's "CVI Range Assessment Scoring Guide" (AR 2081-6), even one of the other CCISD vision impairment instructors admitted that he would not use it as a replacement for such a formal CVI Range Assessment.  AR 3292-3.  He believed that a "formal academic assessment" of CVI must necessarily include such a CVI Range Assessment.  AR 721, 3298-9.

Ms. Zauner-Undesser expressed other concerns with the Coughlin Evaluation as well, such as that it seemed inappropriately to equate color identification with color preference.  AR 506, 3386.  The Coughlin Evaluation also viewed Plaintiff's looking at a candy bowl as relevant to latency, where that act would have nothing to do with the concept of latency.  AR 506, 3387.  Likewise, with respect to the issue of dodgeball, to which the Coughlin Evaluation pointed as an example of latency resolution (AR 506), Ms. Zauner-Undesser noted that dodgeball has movement, which would prompt Plaintiff to attend.  AR 3387-9.  In other words, Ms. Coughlin had erroneously believed that Plaintiff's ability to detect a dodgeball was a sign of positive resolution of certain aspects of the CVI, but missed the fact that Plaintiff can detect the movement in a thrown dodgeball—an ability which does not provide any information about Plaintiff's very different ability to see a stationary object.

Furthermore, the Coughlin Evaluation does not make specific note as to the time of day and related circumstances of the observations it relies upon, whether Ms. Coughlin's own or those of other school district personnel.  AR 506-7, 2081-6.  The observations of the school district personnel are not necessarily inconsistent with the observations and conclusions of Plaintiff's expert, Samantha Zauner-Undesser.  Nothing in Ms. Zauner-Undesser's report or

9

testimony suggest that Plaintiff can never accomplish some of the referenced tasks. *See* Section I.A above. However, it is critical to observe across all times and contexts to see where CVI is having its most substantial impacts. *See* Section I.A above.

Ms. Coughlin and Ms. Reynolds, the orientation and mobility specialist, spoke with Dr. Marcia Moore, because their findings conflicted with hers regarding CVI. AR 3122-5, 3847. However, neither altered her conclusions based on the opposing view.

**D.  Lynne Bach's Uninformed Review of Evaluations and Input at ARD Meeting**

Lynne Bach is a certified teacher for the visually impaired with CCISD. AR 3212. She reviewed the Coughlin Evaluation in conjunction with the CVI Report completed by Ms. Zauner-Undesser. AR 631-671, 3212-4. She documented written comments to the CVI Report on January 17, 2022, and continues to stand by them today. AR 793-815, 3214-9. However, her comments and her testimony demonstrate a complete lack of understanding with respect to CVI and its impacts.

In her comments, Ms. Bach referenced a CVI range performed on Plaintiff in December 2020. AR 793, 3220. She herself had only performed a CVI Range once, and it was not on Plaintiff. AR 3220. She believed erroneously that a CVI Range was a tool to analyze a child with CVI in its preliterary stages. AR 3220. However, as explained below, the CVI Range has nothing to do with any distinction between preliterary stages and other stages. Ms. Bach also mistakenly believed that the material under the heading "CVI Range Assessment Scoring Guide" in the December 2020 Coughlin Evaluation contained a CVI Range or at least "a report of the highest range, Phase III." AR 506-7, 3221-2. However, as Ms. Zauner-Undesser pointed out, there was no CVI Range contained in this document. AR 3392.

Ms. Bach believed, based on the Coughlin Evaluation, that Plaintiff either did not have CVI or that, if he did have it, it was totally resolved, meaning that he has "achieved preliterary

reading skill levels." AR 3222-3. Based on her understanding, total resolution of CVI was equivalent to "achieving preliterary skill levels," meaning the ability to recognize letters and shapes of letters. AR 3222-5. Because Plaintiff could do those things, he had "resolved his CVI in the educational environment." AR 3225. However, the concept of resolving CVI has nothing at all to do with whether a child has achieved preliterary skills. AR 3372-3, 3700-1. Ms. Coughlin herself confirmed this. AR 3852-3. Ms. Bach had not reviewed any other documentation outside of the December 2020 REED to gain greater understanding of the analysis contained in AR 506-7. AR 3225-7.

Ms. Bach generally noted that various observations contained in Ms. Zauner-Undesser's CVI Report did not match up with observations reported in the December 2020 REED. AR 797-8, 3227-32. She noted in the context of the findings on distance vision, localizing, and response to movement that Ms. Zauner-Undesser had not done her observations in the educational environment. AR 795-800. However, as explained in Section I.A above, CVI extends in impact to all environments and would tend to have a more pronounced impact in the educational environment than in the environments in which Ms. Zauner-Undesser observed Plaintiff.[6] In any event, a child's ability to use distance vision, localizing, or response to movement would not differ in the educational environment from other environments. AR 3393-5, 3399. Likewise, Ms. Bach deemed it significant that Plaintiff could identify his colors. AR 798. However, color preference is a characteristic of CVI, not failure to identify colors. *See, e.g.*, AR 3397. Ms.

---

[6] The Hearing Officer noted in the Decision that a prior evaluator, Barry Kran from the Perkins School for the Blind, had not "uncover[ed] the depth or breadth of the features that have been reported." AR 10, 721. However, Mr. Kran in the cited section notes that such features would likely be more pronounced in the educational setting where there is more visual stress. AR 721. This reinforces the point made by Ms. Zauner-Undesser that, because she readily detected Plaintiff's CVI manifestations even in the clinical setting, his CVI would necessarily have an impact in the educational setting.

Zauner-Undesser deemed Ms. Bach's other comments to have similarly little foundation.  AR 3395-6.

Generally, Ms. Zauner-Undesser viewed Ms. Bach's comments and the observations of other CCISD staff members that Ms. Bach and Ms. Coughlin had relied upon as evidence that they had insufficient training in CVI because, if such training is lacking, it is easy to miss the CVI characteristics and to relate them instead to other behaviors.  AR 3396-7.  For example, an untrained individual observing a child with CVI putting his head in his hands while reading might view that as a sign of fatigue or distraction and fail to recognize that CVI is having an impact.  AR 3397.

Ms. Bach's criticisms of Ms. Zauner-Undesser's CVI Report do no more than confirm her own lack of understanding.  For example, Ms. Bach believed that Ms. Zauner-Undesser's CVI Report was incomplete because "CVI Range III is not evaluated[.]"  AR 799.  To the extent that Ms. Bach believed a separate Phase III Assessment tool was required, she was mistaken.  AR 416, 3397-8, 3401-3.  In fact, the CVI Rating Scales used by Ms. Zauner-Undesser assess Phase III as well as earlier phases.  AR 3397-8.  There is a Phase III Extension, but it only deals with preliteracy skills and so has nothing to do with Plaintiff, who can already read.  AR 3398-9.[7]  Consequently, Ms. Bach does not now believe such an "Extension" is necessary to use in the assessment of Plaintiff, because he has, in her view, resolved all CVI issues and is above Phase III, having achieved preliteracy skills.  AR 3249-50.  However, the stages of CVI are not tethered to any distinctions involving preliteracy skills, as discussed above.  On the contrary, as explained

---

[7] Notably, Ms. Bach indicated in her comments that Ms. Coughlin had done a Phase III Assessment as part of the 2020 Coughlin Evaluation.  However, there is no Phase III Extension in AR 506-7 or in AR 2043-2102.  To the extent, Ms. Bach was referring to the Phase III Scoring Guide pages at AR 2081-6, see Section I.C above.  These pages do not constitute part of a CVI Range Assessment at all.

above, the only connection of the CVI analysis to the issue of preliteracy skills is in a very specific assessment device—the Phase III Extension assessment—which has nothing whatsoever to do with Plaintiff himself or with any disputed issue in this case.

The fact that Ms. Bach believed (1) that an extension that only relates to individuals lacking preliteracy skills should have been performed on Petitioner and (2) that Petitioner had necessarily resolved all CVI characteristics precisely because he had attained preliteracy skills demonstrates her complete confusion as to the entire topic.[8]  As explained above, CVI has nothing whatsoever to do with whether a child has preliteracy skills.

Ms. Bach also believed that Ms. Zauner-Undesser's CVI Range Worksheet was incorrect because it had plusses in the minus column in the associated worksheet and because she believed that a CVI Range Worksheet should always show a "flow of improvement."  AR 694, 804, 3236-40.  She believed that, if calculated correctly, even Ms. Zauner-Undesser's CVI Range Worksheet would show a score in the 9-10 range.  AR 3236-40, 3243-4.  However, as an initial matter, as do many others, Ms. Zauner-Undesser simply puts plusses in the minus column rather than minus signs for the sake of visual clarity, but the particular symbol used does not affect the calculations at all.  AR 3377-8.  The calculations can be figured directly from the worksheet.  AR 693-6, 3378-9.  Moreover, even a cursory glance at the worksheet reveals that most of the skills reflective of a score in the 9-10 range are absent with Plaintiff (in other words, there was a plus in the minus column), such that he would not belong in that scoring range.  AR 693-6.  The other CCISD vision impairment instructors saw nothing wrong with the format employed by Ms. Zauner-Undesser.  AR 3274-5, 3289.  With respect to the issue of the CVI Range Worksheet not

_____

[8] According to CCISD administrator Cheryl Moore, Ms. Bach admitted to her after an ARD meeting that Ms. Zauner-Undesser had, in fact, completed the Phase III Assessment.  AR 3713-4, 3718.  However, Ms. Bach did not admit that at the due process hearing.  *See, e.g.*, AR 3251.

consistently showing a "flow of improvement," Ms. Zauner-Undesser explained that CVI students have splintered skills, such that they might be further along in some areas of visual skills than in others, thus scoring lower in some areas of the CVI Range Worksheet than in other areas. AR 3379-80. There is simply no documentation to indicate that Plaintiff falls within a 9-10 scoring range with respect to CVI. AR 3400-1. Once again, Ms. Bach simply lacked understanding as to what Ms. Zauner-Undesser's symbols represented and how to interpret them. Her comments and criticisms merely betray her own lack of any foundation in the subject.

Ms. Bach never contacted Ms. Zauner-Undesser to discuss these purported "errors" in her report. AR 3241. She recognized that Ms. Zauner-Undesser used an appropriate worksheet form to conduct the CVI Range analysis, whether or not she used it correctly. AR 3241. She did not see such a worksheet compiled by any individual at CCISD, including Ms. Coughlin. AR 3241-2.

Ms. Bach had seen the Perkins assessment in AR 712-23. She believed that Ms. Coughlin's assessment constituted a "formal academic assessment" of CVI as recommended by the Perkins assessment. AR 721, 3251-2. However, even Ms. Bach admitted that the documents at AR 2081 and following from which Ms. Coughlin derived her "CVI Range" were not appropriate documents from which to calculate such a range. AR 3244-5. Ms. Zauner-Undesser confirmed that the Coughlin Evaluation would not constitute a "formal academic assessment" for these purposes. AR 3392-3. To constitute such an assessment, it would have had to include CVI Rating Scales I and II. *Id*.

Ms. Bach had also seen the Bellaire Family Eye Care report from October 2020. AR 725-33, 3252-4. However, she disagreed with its conclusion that CVI was "broadly affecting all aspects of [Plaintiff's] performance, including visual, sensory, motor, cognitive, and

14

social/emotional function." AR 731, 3252-4. She disagreed with this conclusion based on the

REED (AR 486-562) and testing documents that showed Plaintiff having success at school. AR

3253-4. With respect to Plaintiff at least, doing well at school was inconsistent in her mind with

the possibility of his having unresolved CVI issues at least with respect to any educational

impact because he had achieved preliteracy skills. AR 3254-5. Once again, Ms. Bach's

perspective on Plaintiff's CVI was vitiated by her confused and erroneous belief that CVI could

be considered resolved once a student had achieved preliteracy skills.

Ms. Bach attended the Reconvene ARD meeting in February 2022 for the purpose of

discussing Ms. Zauner-Undesser's CVI Report. AR 414-420, 3245-6. Ms. Bach did not correct

Ms. Moore when she indicated there was a Phase III assessment missing from Ms. Zauner-

Undesser's CVI Report. AR 416, 3248-9.

**E.    CCISD's Orientation and Mobility Assessment**

Catherine Reynolds, CCISD's orientation and mobility specialist (AR 3075) had not

worked with Plaintiff before called upon to do his evaluation in 2020. AR 3075-6. She has

played no role in the provision of instruction or services to Plaintiff other than working on that

evaluation. AR 3076, 3097. Although Ms. Reynolds testified that some of the information in

her evaluation may have had indirect relevance to CVI (AR 3083), she had no training in CVI

with which to assess that possible relevance, as noted above.

For example, Ms. Reynolds suggested that Plaintiff's ability to identify familiar faces

constituted one area of indirect relevance of her evaluation to his CVI. AR 3083-5. However,

her draft evaluation transmitted to the contract certified vision impairment teacher, Laura

Coughlin, nowhere discusses this supposed ability. AR 1355-8. Only in the final draft does any

reference to this supposed ability appear. AR 501 (noting that Plaintiff "recognized 3 peers

while walking in the hallway approximately 6 feet apart.")[9]  However, Ms. Reynolds did not

know what time of day this occurred or what other relevant circumstances might have existed.

AR 501, 3083-5.  Furthermore, Ms. Reynolds simply leaps to the conclusion that the ability to

identify an individual under the circumstances noted necessarily entails facial recognition.

However, as Ms. Zauner-Undesser pointed out, children with visual impairments have many

mechanisms besides facial recognition available to them to identify others around them.  AR

3405-6.  Furthermore, time of day matters critically in the assessment of a child with CVI.  *See*

Section I.A above.

Ms. Reynolds also noted Plaintiff's ability to distinguish between a male and a female

outside at a distance of thirty feet and his ability to identify red ribbons on a tree as potentially

relevant to his CVI.  AR 3085-6.  Once again, she did not know what time of day these

observations occurred.  *Id*.  She simply took note of them as constituting examples of Plaintiff

having the ability to see and to identify unpredictable objects.  AR 3086-7.  However, these are

issues of acuity and not the sort of issues that tend to implicate CVI.  *See* Section I.A above.

Elsewhere, Ms. Reynolds claimed to have evaluated whether Plaintiff was colorblind or

had a color preference.  AR 3107.  She indicated that she determined he could identify all his

colors.  *Id*.  However, as discussed above, an individual with CVI does not generally have

difficulty with color identification.  *See also* AR 3397 (explaining that Ms. Zauner-Undesser

does not dispute that Plaintiff can identify his colors).[10]  Rather, an individual with CVI often has

---

[9] As it is not referenced in her earlier draft, this incident was presumably observed as part of the
December 1 observation (AR 497), the day after the November 30, 2020 email in which Ms.
Coughlin stated: "Ugh.  Dr. Moore's report diagnosed him with CVI . . . ."  AR 1359.  Only then
does the issue of CVI appear to have entered into the analysis, albeit in cursory form.
[10] Later, Ms. Reynolds indicated that she wanted to be sure Plaintiff could see each color as well
as the other ones, but that ultimately this reduced to a question of whether he could identify these
colors.  AR 3121-2.

a color preference, which has nothing to do with the ability to identify that color or any others. *Id*. Likewise, she deemed it significant that Plaintiff could identify an American flag at a distance and could read street signs. AR 501, 3108-9. Ms. Reynolds thus demonstrated a continued ignorance with respect to the implications of CVI.

## F. Plaintiff's Special Education Teacher

Plaintiff's special education teacher, Michele Smalligan, provided inclusion support, targeted academic support, and consultation for him during the 2021-2022 school year and beyond. AR 3131. She was also his case manager in charge of his Individualized Education Program. AR 3131-2. Other than working with Plaintiff, Ms. Smalligan has no background or experience in working with individuals with CVI. AR 3134-5. This lack of background and experience is evident from her approach to Plaintiff.

She encourages vision breaks for Plaintiff only because it is listed as an accommodation. AR 3137-8. Plaintiff would not ask for such breaks and would refuse them when offered. *Id*. He uniformly indicated that he did not need a break. AR 3138. Ms. Smalligan also offered Plaintiff the accommodation of blue-lined paper to assist in his handwriting. AR 373, 824, 3147-8, 3177-8. He would use it because Ms. Smalligan would not offer him any other kind of paper to use. AR 3148. She offered it only because Plaintiff's mother wanted him to use that kind of paper. *Id*. Plaintiff would resist its use, but Ms. Smalligan would indicate that this paper is what they had to use and would note its appearance on his list of accommodations. AR 3148-9. She never offered any explanation as to why it might appear on that list. AR 3149. Thus, Ms. Smalligan showed no understanding of or commitment to the use of the accommodations granted to Plaintiff. She only employed them because and to the extent that she believed they were required.

17

Ms. Smalligan acknowledged that removal from the General Education environment into a more restrictive environment for purposes of targeted academic support was considered by the ARD committee to have potentially harmful effects by virtue of its potential for stigmatization and making Plaintiff feel different from his peers.  AR 377-8, 3149-50.  She herself testified that she did not notice a tendency in Plaintiff to shy away from situations that would make him feel different from his peers.  AR 3150-1.  However, although she had worked with Plaintiff for two and a half years at the time of the December 2021 ARD meeting reflected in AR 366-413, she does not recall having ever expressed to the ARD Committee that its fears concerning Plaintiff's potential stigmatization were unfounded.  AR 3154-6.  It is precisely Plaintiff's fear of appearing different from his peers, though, that make him less likely to engage in self-advocacy with respect to accommodations and the like, as discussed in Section I.A above.

Ms. Smalligan was involved in the development and implementation of goal number one from Plaintiff's IEP involving phoneme=grapheme mapping.  AR 371, 3139.  Plaintiff had a weakness with respect to spelling in connection with long vowel sounds.  AR 3139.  In the third nine-weeks, for example, Plaintiff obtained an average of 58% for the long /A/ sound.  AR 982-4, 3197-8.  With respect to the long /E/ sound, Plaintiff's data sheets show variations from 22% to 73%.  AR 995-7, 3198.

Ms. Smalligan was also involved in the development and implementation of goal number two in the December 2021 IEP involving reading fluency.  AR 371, 3139-40.  Plaintiff was not reading grade-level material fluently.  AR 3140.  The goal involved having him reach a fluency of 130 words per minute.  AR 371, 3140.  Ms. Smalligan would measure this through one-minute timings, subtracting the incorrect words.  AR 3141-2.  She would time only one minute of his reading through passages that themselves would not take him longer than three minutes to read.

AR 3141-2. *See also* AR 820, 826-7, 874-5, 3176-7, 3179-85. She would offer him a break whenever she envisioned that the entire exercise would last longer than five minutes. AR 3142-3.

With respect to Plaintiff's handwriting, Ms. Smalligan testified that Plaintiff's handwriting would vary in quality depending on whether or not he was writing long and fast. AR 856, 859, AR 3189-92. She was unable to read several of the examples of this handwriting. AR 3189-92. Ms. Smalligan has employed the voice-to-text accommodation with Plaintiff in connection with writing assignments because it made his writing more legible in that it was generated on the computer rather than involving handwriting. AR 3193-5. She would use it with him when supporting his writing class. AR 3195. Plaintiff would not refuse it. *Id.* In fact, he would use it independently in class as well. AR 3196. Thus, CCISD approached Plaintiff's handwriting difficulties and the like by resorting to technological shortcuts, rather than addressing the issue squarely.

**G.     The Administrative Due Process Hearing**

Plaintiff brought an administrative due process complaint based on the facts recounted above. AR 29-39. The parties participated in a due process hearing from January 3, 2023, to January 5, 2023. AR 1. In a decision on March 9, 2023 (AR 1-26; the "Decision"), the Hearing Officer denied the relief sought by Plaintiff. AR 25. As discussed below, the Decision was erroneous.

## II.     ARGUMENT

**A.     Standard of Review**

Under the IDEA, "a federal district court's review of a state hearing officer's decision is 'virtually de novo.'" *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (quoting *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993)). The

"hearing officer's findings should be accorded 'due weight,' but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Id.* (quoting *Teague*, 999 F.2d at 131).

**B.    Defendant's Obligation to Provide a Free Appropriate Public Education**

Under the Individuals with Disabilities Education Act ("IDEA"), public schools must provide disabled students with a "free appropriate public education."  20 U.S.C. § 1412(a)(1)(A); *Richardson Independent School Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009).  In general, as the United States Supreme Court explained in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S 386, 403 (2017), the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

To provide a free appropriate public education to a disabled child for purposes of the IDEA, the state must develop an IEP through IDEA procedures in such a manner that it is "reasonably calculated to enable the child to receive educational benefits."  *Michael Z.*, 580 F.3d at 293.  Moreover, a school district cannot rely on a simple showing that it provided educational benefits of some kind or another.  It must have provided educational benefits appropriate to that child's unique characteristics, needs, and circumstances.  *See, e.g.*, *Endrew. F.*, 580 U.S at 400-1. The Fifth Circuit has articulated four factors that would bear on such an inquiry: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated."  *Michael Z.*, 580 F.3d at 293.  While the Fifth Circuit has held that this four-factor framework remains in place after the Supreme Court's decision in *Endrew F.*, the framework must be applied in full recognition of the requirements imposed by that decision.  *See,  e.g.*, *M.W. v. Rankin County Pub. Sch. Dist.*, No. 3:19-cv-107, 2022 U.S.

Dist. LEXIS 21914, *36 (N.D. Miss. Jan. 5, 2022) ("The *Cypress-Fairbanks* criteria . . . must be evaluated in light of *Endrew F.*")

Here, it is clear that CCISD has failed to evaluate Plaintiff's CVI appropriately with respect to its educational impact.  As explained in Section I.C above, Ms. Coughlin, the contract vision impairment teacher who performed the evaluation in 2020, among other things, (1) did not properly perform the appropriate academic assessment on Plaintiff; (2) misunderstood basic concepts involving CVI characteristics, and thus reached flawed conclusions regarding the presence or absence of such characteristics; (3) failed to take account of the time of day and contexts in which her assessments took place, thus failing to recognize that such assessments must take place across a variety of times and settings; and (4) relied extensively and inappropriately on the observations of untrained personnel, when individuals without training will likely miss behaviors altogether or misattribute them to some causal factor other than CVI.

Lynne Bach, the member of the CCISD CVI team who was primarily responsible for comparing Ms. Coughlin's work with the expansive CVI Report completed by Plaintiff's expert, Ms. Zauner-Undesser, had even less understanding of CVI and made fundamental errors in interpreting the analysis, as explained in Section I.D above.

In the face of this fatally flawed CCISD work with respect to evaluation and assessment issues, CCISD resorts ultimately to the defense that Plaintiff is a highly intelligent and gifted student who surpasses his classmates in many areas, such that CCISD could never have failed to provide him a Free Appropriate Public Education.  In essence, CCISD contends that it has *per se* met its obligations under the IDEA with respect to one so talented.  However, as discussed below, that is not the law.

21

**C.    CCISD Failed to Individualize Plaintiff's Program Appropriately on the Basis of His Assessment and Performance.**

CCISD failed to individualize its educational program for Plaintiff appropriately on the basis of his assessment and performance.

An "IEP is sufficiently individualized if it is 'designed for [the child's] unique needs.'" *D.C. v. Klein Indep. Sch. Dist.*, 860 Fed. Appx. 894, 903 (5th Cir. 2021) (*quoting E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 768 (5th Cir. 2018)).  "Hence, an IEP must provide services that address all of the child's disabilities; significant services addressing one disability are not enough if another disability is left unaddressed."  *D.C.*, 860 Fed. Appx. at 903 (citing *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 585 (5th Cir. 2009)).  The Hearing Officer below ran afoul of these principles.  Although CCISD addressed certain aspects of Plaintiff's circumstances, it left other aspects, such as his CVI, completely unaddressed, as discussed above.  As it is precisely this CVI that now makes it impossible for Plaintiff to receive a Free Appropriate Public Education from CCISD, this was a critical failure.  The Hearing Officer erred in finding otherwise.

As discussed in Section I.A above, Ms. Zauner-Undesser demonstrated that Plaintiff has a wide array of CVI-related characteristics that impact him at all times and across all settings to varying degrees.  Her CVI Report was also consistent with the findings of other professionals in the field that noted the pervasive impact of CVI on Plaintiff.  *See, e.g.*, AR 731, AR 3457-9.  Having reviewed Plaintiff's IEP, having tutored him for over a year, having reviewed the work of other professionals and the notes of CCISD staff members, Ms. Zauner-Undesser has seen nothing to suggest that the findings and recommendations of her CVI Report were incorrect.  Tr AR 3459-61.

As discussed in Section I.C above, Ms. Coughlin's evaluation in December 2020 for CCISD was woefully inadequate and did not even constitute a formal academic assessment by the admission of one of CCISD's own vision impairment instructors.  Ms. Coughlin did not use a CVI Range Assessment, even though she had used one on almost every other CVI assessment she had done up to that point.  She took no account of critical features of a CVI assessment, such as the time of day of observations and the circumstances surrounding those observations.  She also made basic analytical mistakes as to the meaning of certain CVI concepts.  She relied on the observations of untrained personnel, which further vitiated her conclusions.[11]  Likewise, as discussed above, Ms. Bach, the vision impairment instructor who compared the Coughlin Evaluation with Ms. Zauner-Undesser's CVI Report and on whom the ARD Committee expressly relied, had such a fundamentally flawed understanding of CVI and of the CVI Report that her input to the ARD Committee necessarily distorted its understanding and conclusions.

As further discussed in Sections I.C and I.D, despite knowing that the experts in CVI uniformly found that it had substantial impacts on Plaintiff, the CCISD personnel, including Ms. Coughlin, Ms. Bach, and Ms. Reynolds uniformly disregarded the input of those experts.  Furthermore, even if they somehow had confidence in their own fatally flawed evaluation, a CVI assessment should be done three times a year as even one of CCISD's own vision impairment instructors understood.  AR 3293, 3453.

---

[11] Even CCISD's own administrator, Cheryl Moore, understood that CVI might manifest itself very differently for different individuals, such that, depending on the student, staff might need additional training to grasp the particular manifestations of the disability.  AR 3681-3. Nevertheless, she herself had misapprehensions as to how CVI characteristics, such as a CVI meltdown, might manifest for Plaintiff.  AR 3617-8, 3690-1.

In light of this complete failure to address the needs associated with Plaintiff's CVI, CCISD failed to individualize his educational program appropriately on the basis of assessment and performance.  *See, e.g.*, *P.P. v. Northwest Indep. Sch. Dist.*, 839 Fed. Appx. 848, 855-6 (5th Cir. 2020) (finding an IEP not individualized where it did not address whole subsets of needs, although it did address others).

The administrative Hearing Officer below erred in rejecting the analysis above.  As an initial matter, the Hearing Officer notes that CCISD included consult services from a Teacher of the Visually Impaired ("TVI") in Plaintiff's Individualized Education Program ("IEP"), despite not finding Plaintiff eligible under the category of visual impairment.  AR 17.  However, as explained above, CVI is a brain-based condition impacting every aspect of academic and non-academic instruction and performance.  Ms. Zauner-Undesser, the only actual expert in CVI who testified or provided any evaluations in this matter, determined that Plaintiff's CVI must necessarily have a pervasive impact on his education.  *See* Section I.A above.  As a brain-based condition, CVI is very different from the ocular impairments with which most TVIs are familiar.  Consequently, it is insufficient simply to hold that CCISD presented an individualized program for Plaintiff merely because it had a TVI consult concerning his education.  In fact, as demonstrated in Section I.C above, Lynne Bach, CCISD's TVI, was completely lacking in relevant knowledge concerning CVI.  Plaintiff has unique visual needs that impact every aspect of his education.  CCISD was incapable of addressing those needs.

The Hearing Officer determined that "the District's decision to not accept the Zauner-Undesser's report's conclusion was based on the District's own assessment data and experience with Student that contradicted Ms. Undesser's findings."  AR 18.  However, as demonstrated above, CCISD had no personnel capable of analyzing the data, particularly because, as Ms.

Zauner-Undesser herself pointed out, teachers and staff who are untrained in CVI frequently cannot recognize what they are observing.  *See* Section I.C above.  Thus, it is insufficient simply to indicate that CCISD personnel disagreed with Plaintiff's expert and to hold against Plaintiff as a result.  *See, e.g.*, *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993) ("Indeed, if the views of school personnel regarding an appropriate educational [program] for a disabled child were conclusive, then administrative hearings concluded by an impartial decisionmaker would be unnecessary.")

     The Hearing Officer further noted that "Ms. Zauner-Undesser testified that a key reason Student should be considered eligible for special education based on a VI and receive services from a TVI would be so that a TVI could educate Student's teachers on CVI and supporting Student's needs."  AR 18.  It is true that Plaintiff's expert indicated the need for the "services of a teacher of the visually impaired in the school district to address his CVI needs across the educational day."  AR 3374.  However, Plaintiff's expert was clearly recommending the use of a qualified TVI and not a TVI who lacked any understanding of CVI.  Furthermore, Plaintiff's expert was calling for the TVI to provide services to address Plaintiff's CVI needs in every aspect of his education and not merely to perform a limited consulting role.  Thus, the Hearing Officer's conclusion was in error that the "IEPs at issue have already provided that through consult with a TVI and Student-specific staff training on his visual fatigue needs and accommodations."  AR 18.

     The Hearing Officer made two more fundamental errors in the analysis of this issue. First, the Hearing Officer construed Plaintiff as "primarily argu[ing] that the District's 2020 evaluation did not adequately assess Student's CVI" and then noted that the "appropriateness of the evaluation is not an issue in [the] case[.]"  AR 18.  However, with this comment, the Hearing

Officer misconstrues the thrust of Plaintiff's argument. Plaintiff does not engage in some mere abstract challenge to CCISD's 2020 evaluation. Rather, Plaintiff conclusively demonstrated that CCISD itself lacks the institutional knowledge to understand, to analyze, and to address his CVI needs. This lack is demonstrated all the way from the 2020 evaluation to Lynne Bach, the TVI who fundamentally misunderstood the most basic concepts of CVI, to the teachers and staff who did not understand what they were looking at with Plaintiff because they lacked the training even to know what they should try to observe. As explained in Section I.D above, Lynne Bach, the TVI, relied on the 2020 Coughlin Evaluation in reaching her own conclusions with respect to Plaintiff. Thus, the validity, foundation, and coherence of that evaluation are issues for this case because they impact the actions and omissions of the teachers and staff working with Plaintiff. However, even more fundamentally, the evaluation is just one piece of Plaintiff's larger showing that CCISD's personnel, both individually and collectively, had little to no comprehension of the condition they were tasked with addressing.

Second, the Hearing Officer indicated that "there is no statutory or regulatory requirement that any particular assessment protocol be used for an IDEA-compliant evaluation of a potential VI." AR 18. Once again, the Hearing Officer misconstrued and misunderstood Plaintiff's arguments and evidentiary showing. Plaintiff never argued that there was a statutory or regulatory requirement that CCISD use the CVI Range as an assessment protocol for an IDEA-compliant evaluation or for resultant educational programming. However, Plaintiff has conclusively shown that CCISD did not use any other assessment protocol. In fact, as discussed in Sections I.C and I.D above, CCISD evaluators and teachers pointed to Dr. Christine Roman's CVI Range as the tool on which their own assessments and determinations were based, but did not adhere to its fundamental tenets and showed a complete lack of understanding as to how to

employ it.  Although the CVI Range is the most widely used assessment tool for CVI, it is not the only tool.  However, CCISD tried to use it and failed.  Their conclusions are thus vitiated and cannot serve as the basis for an individualized program for Plaintiff.

**D.    CCISD Failed to Apply the Principles Underlying the IDEA's Least Restrictive Environment Requirement Appropriately.**

The IDEA requires that "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of  a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).

CCISD has taken this concept beyond its appropriate limit with Plaintiff by failing to educate him appropriately with respect to his unique differences from his typically developing peers.  As discussed in Section I.F above, CCISD recognized that removal from his peers had the potential to stigmatize Petitioner.  As explained in Section I.A above, Plaintiff is himself highly sensitive to this possibility and thus tries to develop coping mechanisms so as not to appear different.  Unless CCISD instructs him in self-advocacy, which ultimately involves a willingness to admit and to embrace certain differences from peers, it cannot adequately address his needs associated with CVI.  As explained in Section I.F above, CCISD has failed to do so up to this point, declining to explain Plaintiff's accommodations to him or to provide any justification for them other than the bare fact that they appear on a list of accommodations for him.  CCISD thus gives Plaintiff every disincentive to accept and to make use of those accommodations.

**E.      CCISD Failed to Provide Services in a Coordinated and Collaborative Manner.**

CCISD failed to provide services in a coordinated and collaborative manner.  As explained in Sections I.C through I.F above, CCISD staff members uniformly rejected the input of Plaintiff's mother with respect to his CVI, despite the fact that her input was supported not only by Plaintiff's own expert and private tutor, but by every expert in CVI that evaluated him. As discussed in Section I.C above, CCISD personnel were well aware of the views of these CVI experts and even contacted Dr. Marcia Moore.  However, despite the drastic lack of experience of their own vision team and the fact that other staff members had no alternative but to rely on input from that team, CCISD did not give serious consideration to the CVI Report or to other expert evaluations, but sought only to defend their own approach.  *See* Sections I.C to I.F above. The Hearing Officer rejected this analysis primarily because the Hearing Officer simply accepted the conclusions of those very teachers and staff as to Plaintiff's CVI.  However, Plaintiff has conclusively shown that those teachers and staff lacked the knowledge necessary to understand and to analyze his CVI.  To reject the input of those who possessed such knowledge constitutes a failure to collaborate.

**F.      CCISD Failed to Provide Petitioner with an IEP Appropriately Designed to Provide Positive Academic and Non-Academic Benefits**

Under *Endrew F.*, 580 U.S 386, a school district must design "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Id*., at 403.  As a necessary prerequisite to designing such a program, a school district must have an understanding of the child's circumstances in the first place.  CCISD has no such understanding and consequently has been unable to promote appropriate progress.

As an initial matter, although *Endrew F.* indicates that an IEP for the General Education classroom is typically designed to enable a child to achieve passing marks and advance from

grade to grade (580 U.S. at 401), it does not indicate that an IEP need only perform that function to pass muster under the IDEA.  Performing that function is, in other words, necessary but not always sufficient.  Where the IEP does not address a whole subset of needs of the student, it is inadequate under the IDEA.  *See, e.g.*, *Z.B. v. D.C.*, 888 F.3d 515, 528 (D.C. Cir. 2018) ("Disabilities can be subtle and complex.  They may require expertise to identify accurately.  The IDEA requires public schools to be alert to the needs of all students they serve.")  As discussed in Sections I.C through I.E above, CCISD failed utterly to assess and to identify Plaintiff's CVI-related characteristics and needs appropriately.  It thus failed to design an appropriate IEP to promote progress based on his unique characteristics, circumstances, and needs.

Plaintiff's special education teacher, Ms. Smalligan, noted that he had made progress with respect to certain reading fluency goals.  *See, e.g.*, AR 3925-30.  However, as discussed in Section I.E above, these measurements were entirely based on one-minute timings of reading speed during the reading of passages approximately three minutes long.  Such measurements do not address the varied impact of CVI throughout the day, particularly when visual fatigue sets in during the reading of longer passages.  *See* Section I.A above.  Consequently, the academic progress and benefit measured are limited to the precise and artificial circumstances presented, rather than the types of issues Plaintiff actually encounters during the course of the day, in which he may be called upon to read longer passages when visual fatigue has set in.  CCISD has not designed an educational program to address his unique characteristics, circumstances, and needs, as required by *Endrew F.*  After all, even CCISD's own administrator, Ms. Moore, understood that, even if Plaintiff were reading at a high level, for example, it would be important for CCISD to understand the impact of CVI on that reading.  AR 3680-1.  Likewise, even if he were reading

at a high level, it would be important for CCISD to understand and to address any CVI
meltdowns and the like.  AR 3681.

 With respect to spelling, Plaintiff's level of progress depended on the specific phoneme-
grapheme pair employed.  *See, e.g.*, AR 598 (showing no mastery of "ey," "ei," and "eigh"
words even in March 2022).  However, critically, the progress reports themselves demonstrate
that CCISD was throwing a wide array of phoneme-grapheme combinations at Plaintiff at once,
rather than through a sequence carefully defined by reference to his levels of attention and
fatigue, as impacted by his CVI.  *See* Section I.B above.  Without appropriate evaluations
serving as the foundation for these exercises, CCISD has no mechanism with which to determine
whether they were designing IEP goals capable of allowing Plaintiff to make progress
appropriate to his unique characteristics, circumstances, and needs.  As Ms. Decker explained in
Section I.B above, it would be critical to understand the impact of CVI in the course of designing
an appropriate program for Plaintiff.

 With respect to his handwriting, Ms. Smalligan would encourage the use of speech-to-
text because his handwriting was so illegible.  *See* Section I.F above.  In fact, sometimes Ms.
Smalligan would even write for him.  AR 3932-4.  CCISD thus demonstrated a tendency to gloss
over his unique needs, rather than addressing them squarely and in a manner designed to promote
appropriate progress.

**G.** **Plaintiff Requires as a Remedy that CCISD Develop and Implement an Appropriate
IEP and Contract with a CVI  Mentor for this Purpose.**

 As explained above, CVI impacts all aspects of Plaintiff's education.  As detailed above,
a failure to address CVI appropriately can have even wider impacts as well, implicating his
safety and his emotional health inside and outside of school.  *See, e.g.*, AR 1402-3.

Thus, to develop an appropriate IEP for Plaintiff, CCISD must retain a consultant with expertise in CVI, approved by Plaintiff or his designated expert, to supervise the development and implementation of an appropriate IEP for Plaintiff, must actually adopt the recommendations of that expert, as opposed to discarding them in the manner demonstrated up to this point, and must provide appropriate training to its staff members.  Furthermore, CCISD should recognize Plaintiff's CVI-related needs and characteristics and deem him eligible for special education under the category of visual impairment.  Furthermore, to address and to remediate some of the deficits in CCISD's approach to Plaintif's education, Plaintiffs mother has had to hire Ms. Zauner-Undesser as a private tutor.  *See* Section I.A above.  Reimbursement of the associated expenses, reflected in AR 1441-68, would be an appropriate remedy.  AR 3415.

### III.    CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that this Court reverse the order of the administrative Hearing Officer below and grant the relief requested by Plaintiff in this matter, including the relief specified in Section II.E above and any other relief appropriately awarded to Plaintiff.

DATED: November 11, 2024

Respectfully submitted,

＿＿/s/ Mark Whitburn＿＿＿＿＿＿＿
Mark Whitburn
State Bar No. 24042144
Sean Pevsner
State Bar No. 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served by electronic filing service on

counsel of record for Defendant on November 11, 2024, as follows:

Janet Horton
Thompson & Horton LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027

_____/s/ Mark Whitburn_____

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with Janet Horton, counsel of record for Defendant, by

email on November 11, 2024, and Ms. Horton represented that she was opposed to the relief

requested in the foregoing Motion.

_____/s/ Mark Whitburn_____