United States District Court
Southern District of Texas

**ENTERED**

March 03, 2026

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES F., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:23-cv-02063 |
| | § | |
| CLEAR CREEK INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Plaintiff James F., a minor child, by and through his next friends and parents Christine F. and Michael F., brought this lawsuit seeking review of an unfavorable decision in an administrative hearing regarding James F.'s disability accommodations under the Individuals with Disabilities Education Act ("IDEA"). Pending before me are competing motions for judgment filed by Defendant Clear Creek Independent School District ("CCISD") (Dkt. 39) and James F. (Dkt. 41). Having reviewed the briefing, the record, and the applicable law, CCISD's motion is granted and James F.'s motion is denied.

## BACKGROUND

### A. JAMES F.'S EDUCATIONAL BACKGROUND

This case centers on the 2021–2022 school year, when James F. attended Brookwood Elementary School in CCISD as a fourth-grade student. James F. had first been designated as eligible for special education services as a kindergarten student in the 2017–2018 school year based on attention deficit hyperactivity disorder ("ADHD").

In the fall of 2020, CCISD conducted a triennial reevaluation of James F. As part of that evaluation process, James F.'s mother "expressed concerns in the area

of vision." 2 AR 566.[1] CCISD completed updated assessments in the areas of language, functional vision assessment, learning media assessment, occupational therapy, psychological, cognitive, academic achievement, and assistive technology. *See id.* at 563–74.

In October 2020, Dr. Marcia Moore diagnosed James F. with cortical visual impairment ("CVI"). *See* 3 AR 726. CVI "is a decreased visual response due to a neurological problem affecting the visual part of the brain." *Id.* at 739. Characteristics of CVI include distinct color preference, delayed visual response, abnormalities of visual field, difficulty with unfamiliar visual stimuli, preference for looking at lights, and unusual visual behaviors. *See id.* at 740.

After conducting a full and individualized evaluation ("FIE") dated December 4, 2020, CCISD found James F. eligible for special education services as a student with a specific learning disability in reading fluency and other health impairment ("OHI") for ADHD, convergence insufficiency, binocular vision dysfunction ("BVD"), chronic inflammatory response syndrome ("CIRS"), and CVI. *See* 2 AR 551, 561–62. James F. also met the Texas Education Agency's criteria for dyslexia and dysgraphia. *See id.* at 549.

The FIE did not find that James F. qualified as visually impaired ("VI"). *See id.* at 488. Laura Coughlin, a certified teacher of the visually impaired ("TVI") and retired teacher at CCISD, evaluated James F. and found that his CVI did not result in an adverse impact on his performance in an educational environment. *See id.* at 509.

The Admission Review and Dismissal Committee ("ARDC") developed an individualized education program ("IEP") for James F. in December 2020. *See id.* at 462–85. The ARDC met on March 30, 2021 to make minor corrections to the IEP. *See id.* at 455. The ARDC met again on May 26, 2021 to review James F.'s

---

[1] The Administrative Record ("AR") was provided to the court on a USB drive. *See* Dkt. 17. All citations to the Administrative Record refer first to the Volume, then to the specific page number with leading zeros omitted.

performance on the December 2020 IEP. *See id.* at 445–54. Because James F. had already met certain goals, the IEP was updated. *See id.* James F.'s parents disagree with his eligibility determination and believe that James F. should be labeled as a student who is VI with a learning disability in written expression.

At the beginning of the 2021–2022 school year, James F.'s mother expressed disagreement with the IEP developed at the May 2021 ARDC meeting and requested another ARDC meeting. The ARDC met again on September 27, 2021. At that meeting, the ARDC included four goals in James F.'s IEP: (1) James F. will read 85 words correctly (something he had already mastered); (2) James F. will develop a draft writing satisfying certain requirements; (3) James F. will read grade-level text fluently at a rate of 130 correct words per minute in eight out of nine opportunities; and (4) James F. will match letter sounds and letter names to form words with long vowels. *See id.* at 436–47. The ARDC identified services and support necessary to implement the IEP. *See id.* at 434. These accommodations included 80 minutes per week of individual academic support to address his reading fluency issues, 60 minutes per week of in-class support focused on writing, and occupational therapy to assist with his dysgraphia and writing. *See id.*

James F.'s fourth grade teachers implemented his IEP. Michelle Smalligan, a special education teacher, provided in-class support for James F. Despite his advancement and success in the classroom, James F. insists that CCISD has failed to address his CVI because of its mistaken belief that his CVI has no educational impact in the school setting. *See* Dkt. 1 at 2. James F. argues that he struggles with reading, spelling, and handwriting because of CCISD's ignorance regarding CVI.

James F.'s mother retained an independent TVI, Samantha Zauner-Undesser, to assess the impact of James F.'s CVI on the learning process. Zauner-Undesser found that James F. displayed difficulties with facial recognition, behavioral concerns, and visual field neglect caused by his CVI. *See* 3 AR 637–42. Zauner-Undesser further determined that James F.'s CVI impacted him functionally in all settings, and that he requires a TVI to address his CVI needs

throughout the entire school day—as well as instruction in self-advocacy and accommodations in the classroom. *See id.* at 649–53.

The ARDC met again in December 2021. The ARDC removed several goals that James F. had mastered (Goals 1 and 2) and continued certain goals that James F. had not yet mastered (Goals 3 and 4). *See* 2 AR 371; 4 AR 1532–36. The ARDC increased James F.'s academic support for reading fluency and spelling, and included accommodations specific to CVI, such as breaks for eye fatigue and the use of blue-lined paper for writing. *See* 2 AR 373, 383. James F.'s mother disagreed with the new IEP. She wanted the ARDC to follow Zauner-Undesser's recommendation that a TVI oversee the creation and implementation of James F.'s IEP. The ARDC met in February 2022 to review Zauner-Undesser's report and compare it to CCISD's FIE. *See id.* at 414–20. After spending significant time meeting with teachers and other experts regarding Zauner-Undesser's report, the ARDC concluded that James F.'s CVI caused no negative impact in an educational setting, and he did not require direct services from a TVI as Zauner-Undesser had recommended. *See id.* at 427–29.

The 2021–2022 school year continued and Kirsten Clason, James F.'s homeroom, math, social studies, and science teacher, reported that she implemented James F.'s IEP accommodations in her class, but James F. would consistently say he did not need such accommodations. *See* 5 AR 3748–54. James F. performed at a high level in math, science, and social studies and scored very well on standardized testing. *See* 2 AR 579; 4 AR 1517–20. Clason understood the characteristics of James F.'s CVI and constantly monitored him, but James F. did not display any CVI characteristics in her classroom. *See* 5 AR 3746–47, 3756–64. By the end of the school year, James F. met or exceeded fourth grade expectations in all his subjects, except for one grade-level standard in writing. *See* 2 AR 579. James F. did not have any major behavior issues in Clason's classes and received almost all "Excellent" scores for his conduct during the 2021–2022 school year. *See id.* Additionally, James F. performed well overall in his reading and writing

courses. James F. read with great fluency compared to other students with dyslexia in his reading class. *See* 5 AR 3894. As documented in his report card, James F. made overwhelming progress in reading and writing during the time that his IEP was in effect. *See* 2 AR 579.

**B.    THE HEARING OFFICER'S DECISION**

James F. brought an administrative due process complaint against CCISD. A due process hearing took place in January 2023. The hearing officer focused on (1) whether CCISD failed to provide James F. a free, appropriate public education ("FAPE") during the 2021–2022 school year and (2) whether CCISD appropriately implemented James F.'s IEP. *See* 1 AR 2. The hearing officer noted that although the ARDC "did not find [James F.] eligible based on a VI, CVI was included as an OHI and the IEP included consult services by a TVI to support [James F.]'s teachers to address his CVI." *See id.* at 17. The hearing officer held that CCISD had no obligation to accept Zauner-Undesser's conclusions because CCISD reached a decision based on its own assessment data and experience with James F., which contradicted Zauner-Undesser's findings. Specifically, the hearing officer concluded that James F.'s IEP was, at all times, "appropriately individualized . . . to meet his particular CVI-related needs." *Id.* at 19. The hearing officer concluded that James F.'s IEP "was administered in the least restrictive environment and he was included [in the general education classroom] to the maximum extent appropriate." *Id.* at 21.

James F.'s parents participated in the ARDC and had the opportunity to share their concerns and suggestions. The hearing officer found that the evidence showed extensive collaboration among CCISD staff, teachers, doctors, specialists, a TVI, and James F.'s parents. The hearing officer held that failure to agree with a parent does not show a failure to collaborate, and James F. failed to show that CCISD excluded his parents in bad faith. *See id.* at 23. Finally, the hearing officer concluded that James F. meaningfully benefitted from his IEP as evidenced by his many academic and non-academic achievements, including his success on

standardized testing, meeting all but one grade-level standard, mastering his IEP goals, and his successful relationships with teachers and peers. *See id.* In conclusion, the hearing officer held that CCISD provided James F. with a "FAPE and his IEPs were reasonably calculated to address his needs in light of his unique circumstances during the 2021–2022 school year."[2] *Id.* at 25.

James F. brought this lawsuit on June 6, 2023, appealing the decision of the administrative hearing officer pursuant to 20 U.S.C. § 1415(i). James F. argues that the hearing officer erred in her conclusions.

## LEGAL STANDARD

Under the IDEA, "[a]ny party aggrieved by the findings and decision" of an administrative hearing officer may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). The district court must then "receive the record of the administrative proceedings" to review the hearing officer's decision. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997). Although "due weight" is to be given, the hearing officer's findings are not conclusive. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). "The district court's review of the [hearing officer]'s determination is virtually *de novo*. That is, although the district court is to give due weight to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 213 (5th Cir. 2019) (cleaned up). This standard, however, "is 'by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which

---

[2] As to the second issue that was before the hearing officer—whether CCISD appropriately implemented James F.'s IEP—the hearing officer found that James F. had abandoned his claim. *See* 1 AR 24 ("Petitioner did not present evidence that the District failed to implement Student's IEP during the relevant time period and appears to have abandoned this claim by not addressing it in his Closing Brief."). Because James F. likewise fails to argue this claim in his briefing before this court, the claim is abandoned.

they review.'" *R. S. v. Highland Park Indep. Sch. Dist.*, 951 F.3d. 319, 328 (5th Cir. 2020) (quoting *Rowley*, 458 U.S. at 206).

My review "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018) (quoting *Seth B. v. Orleans Parish Sch. Bd.*, 810 F.3d 961, 966–67 (5th Cir. 2016)); *see also C.G. v. Waller Indep. Sch. Dist.*, No. 4:15-cv-00123, 2016 WL 3144161, at *4 (S.D. Tex. June 6, 2016) ("[A] motion for summary judgement [sic] is simply a procedural device for asking the Court to decide the case on the basis of the administrative record." (quotation omitted)).

As the party appealing the hearing officer's decision, James F. carries the burden of proof. *See Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 n.4 (5th Cir. 2009) ("[W]e hold that at the district court level, as at the administrative level, the party challenging the IEP bears the burden of showing that the IEP and the resulting placement are inappropriate under IDEA.").

## EVIDENTIARY OBJECTION

In its reply brief, CCISD objects to James F.'s "attempt to introduce additional evidence" in his response to CCISD's motion. Dkt. 49 at 31. Specifically, CCISD alleges that James F. attempts to introduce a manuscript, *Emotion Processing in Early Blind and Sighted Individuals*, that is not found in the administrative record. Although CCISD is correct that this manuscript is not found in the administrative record, James F.'s reference to the manuscript has no effect on my decision, so CCISD's objection is denied as moot.

**ANALYSIS**

"To ensure that a child receives a FAPE, parents and school districts collaborate to develop an [IEP] that is reasonably calculated to enable the child to receive educational benefits." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (quotation omitted). The IEP must be specifically designed to meet the unique needs of a particular child with a particular disability at no cost to the parents. *See* 20 U.S.C. § 1401(29); *see also Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) ("The IEP is the means by which special education and related services are tailored to the unique needs of a particular child." (quotation omitted)). An IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Michael F.*, 118 F.3d at 247–48 (quotation omitted). For an IEP to be tailored to a child's unique needs, it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399. "[T]he question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.*

District courts use a four-factor test "derived from . . . the federal regulations which implement the IDEA" to determine whether the IEP is reasonable. *Michael F.*, 118 F.3d at 253 n.29. These factors ask whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Id.* at 253. I address each factor below.

## A.   CCISD PROVIDED JAMES F. AN INDIVIDUALIZED IEP

The first factor asks whether the IEP is individualized based on the student's assessment and performance. *See Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347–48 (5th Cir. 2000) (citing *Michael F.*, 118 F.3d at 253). An IEP need not

provide "every special service necessary to maximize each . . . child's potential." *Rowley*, 458 U.S. at 199. Rather, "[t]he IEP must aim to enable the child to make progress." *Endrew F.*, 580 U.S. at 399.

James F. claims that CCISD "failed entirely to address [his] CVI and its educational impacts." Dkt. 1 at 4. CCISD assessed James F. in December 2020 and found him to be a student with a specific learning disability and other health impairments. CCISD had a duty to craft an IEP that would specifically address James F.'s disabilities. The hearing officer found that CCISD created and implemented an adequate IEP "sufficiently individualized on the basis of assessment and performance" to meet James F.'s unique needs, including CVI and dyslexia. 1 AR 16. I agree.

James F.'s primary argument is that "CCISD addressed certain aspects of [his] circumstances," but "left other aspects, such as his CVI, completely unaddressed." Dkt. 41 at 25. Specifically, "Coughlin's evaluation in December 2020 . . . was woefully inadequate" because "Coughlin did not use a CVI Range Assessment" or any other "formal academic assessment." *Id.* at 26. In response, CCISD agrees with the hearing officer that "there is no statutory or regulatory requirement that any particular assessment protocol be used for an IDEA-compliant evaluation of a potential VI." 1 AR 18. Despite this, James F. argues that his IEP is not individualized on the basis of his needs because Coughlin, the CCISD evaluator, "failed to use [the CVI Range Assessment] properly." Dkt. 44 at 15. Even if that is true, James F. fails to prove that Coughlin's evaluation was unreliable.

> [T]he record before the Court shows a thorough assessment of [James F.]. Although the Court declines to cite every portion of the record . . . in this decision, the Court finds that Plaintiff['s] challenges to the decisions of [CCISD] in assessing [James F.] simply do not state a violation of the IDEA. The administrative record and even Plaintiff['s] own factual allegations here are replete with evidence of the variety of assessment tools and strategies used to evaluate [James F.]. . . . That Plaintiff[] did not agree with the decisions made by the evaluation team assessing [James F.] simply is not enough to sustain [his] burden in showing [James F.] was not assessed in accordance with the

9

> IDEA's requirements. Thus, . . . the preponderance of evidence before the Court supports the . . . conclusion that the FIE was a thorough, valid assessment of all of [James F.'s] suspected disabilities.

*Z.H. ex rel. R.H. v. Lewisville Indep. Sch. Dist.*, No. 4:12-cv-775, 2015 WL 1384442, at \*10 (E.D. Tex. Mar. 24, 2015) (quotation omitted).

James F. argues that CCISD staff were uneducated in CVI and thus unable to identify CVI characteristics or properly evaluate him. But James F. provides no evidence to support these arguments beyond stating that "Coughlin had only administered a CVI Range Assessment five times previously . . . and none of them were of a child at Phase III of CVI." Dkt. 41 at 11. The fact that CCISD's evaluator may have less experience than Zauner-Undesser does not prove that Coughlin's evaluation of James F. was inadequate. Further, merely presenting evidence of an expert who uses different evaluation protocols and reaches a different decision does not prove that CCISD's evaluation is faulty. The IDEA does not require a specific tool or evaluation protocol to assess James F. for CVI. James F. points to nothing that requires this court to favor Zauner-Undesser's conclusions over the conclusions of CCISD's experts.

Overall, James F. argues that he "does not merely challenge the [2020 FIE re-]evaluation itself as an independent issue," but "challenges [CCISD's] uninformed reliance on the FIE, despite the obvious flaws in it that were exposed by the submission provided by [Zauner-Undesser]." Dkt. 50 at 3. Notably, however, "Undesser's report was not provided to the school district until a year after the first IEP was created." Dkt. 53 at 17–18. After receiving Zauner-Undesser's report, CCISD considered it along with the rest of James F.'s file and found that no significant changes to James F.'s IEP were warranted based on her conclusions. After reviewing CCISD's evaluation and Zauner-Undesser's evaluation, I agree with the hearing officer that James F.'s arguments regarding the adequacy of CCISD's evaluation of him do "not overcome the preponderance of the evidence indicating that his IEPs were appropriately individualized and

10

based on assessment and performance to meet his particular CVI-related needs." 1 AR 19.

James F. does not argue that the accommodations found in his IEP are insufficient but instead takes issue with CCISD's conclusion that James F. is not VI. James F.'s argument is misplaced. "Various courts throughout the nation have . . . held that school districts are not required to classify a student into a particular category, or affix that student with a particular label. Instead, the IDEA only requires that the school district provide an appropriate education." *G.I. v. Lewisville Indep. Sch. Dist.*, No. 4:12-cv-385, 2013 WL 4523581, at *10 (E.D. Tex. Aug. 23, 2013). Because James F.'s IEP included a statement of his present levels of academic achievements and performance, contained measurable annual goals designed to meet his needs, and allowed for numerous accommodations relating to his disabilities and academic challenges, CCISD designed and implemented an IEP that was appropriately individualized to address James F.'s unique needs regarding his CVI diagnosis. As a result, this factor weighs in CCISD's favor.

**B.    THE IEP CONSTITUTES THE LEAST RESTRICTIVE ENVIRONMENT**

The second factor requires first determining "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 466 (5th Cir. 2022) (quotation omitted). "If the answer is no, and the school intends to provide special education or to remove the child from regular education, [I] then ask whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (quotation omitted). "Mainstreaming refers to educating a handicapped child in a regular education classroom with nonhandicapped children." *Id.* at 460 (cleaned up). "This preference [for mainstreaming] is only overcome when education in a regular classroom cannot meet the handicapped child's unique needs." *Id.* at 461 (quotation omitted).

To determine whether the IEP constitutes the least restrictive environment, the Fifth Circuit considers four factors:

(1) whether the state has taken steps to accommodate the handicapped child in regular education;

(2) whether the child will receive an educational benefit from regular education;

(3) the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child; and

(4) what effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving.

*Id.* at 466 (quotation omitted).

CCISD took many steps to accommodate James F. in the general classroom, including giving him reading breaks, blue-lined paper, and assistance in reading and writing with the help of an in-class support teacher. James F. certainly received an educational benefit in his classroom as he participated in classroom activities, was successful in his classroom job as a door greeter, enjoyed playing with other students, engaged with his classmates, had positive relationships with his teachers, and excelled academically in the general classroom. *See* 5 AR 3781–82. Throughout James F.'s fourth-grade year, the ARDC repeatedly amended James F.'s IEP to address his parent's concerns and provide new goals as James F. achieved the goals originally set in his IEP. *See* 2 AR 414–26, 430–61.

James F. received good scores for classroom conduct, suggesting that he adequately interacted with his peers and performed well among non-disabled children. James F. spent time with Smalligan outside of the general education classroom, but such time was properly limited to avoid James F. being pulled out of the general classroom unnecessarily. Throughout his fourth-grade year, James F. was removed from the general classroom for special education for varying times not to exceed 140 minutes per week depending on the IEP in place. Overall, CCISD kept James F. in general education while increasing special education support and in-class accommodations, and thus "mainstreamed [James F.] to the maximum extent appropriate." *H.W.*, 32 F.4th at 471.

James F. argues that CCISD failed to instruct him in self-advocacy and failed to explain his accommodations to him, such that he faced stigmatization when removed from the general classroom. *See* Dkt. 41 at 30. The hearing officer found that James F. "did not specifically challenge the restrictiveness of [his] educational placement." 1 AR 20. Further, James F. "did not present evidence that the potential stigmatization of removal from the general education setting outweighed the benefits provided" to him, and held that "[t]he presence or absence of instruction related to self-advocacy is not an LRE issue." *Id.* at 21. I agree; it is clear that James F.'s IEP constitutes the least restrictive environment.

This *Michael F.* factor focuses on whether James F. "could be satisfactorily educated in the regular classroom with supplemental aids and services," *H.W.*, 32 F.4th at 466, not whether James F. understands the purposes of his accommodations or feels that he "appear[s] different" than his peers. Dkt. 41 at 30. James F. often preferred to work individually in the classroom and sometimes denied the need for his accommodations, but his teachers did not observe these actions as a sign that he was struggling. Rather, James F. succeeded academically and thrived in the general classroom environment. The Fifth Circuit agrees that "an IEP cannot be held inadequate merely because it does not address all of the specific weaknesses a child might have by virtue of that child's disability." *H.W.*, 32 F.4th at 468 (quotation omitted). Rather, this factor only requires that I determine whether James F.'s educational environment is suitable for him. Because James F. could "grasp the essential elements of the regular education curriculum," *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1049 (5th Cir. 1989), and James F. has not put forth sufficient evidence that his potential lack of self-advocacy caused him to struggle in the general classroom, this factor weighs in favor of CCISD.

**C.     CCISD PROVIDED SERVICES IN A COORDINATED AND COLLABORATIVE MANNER**

The third factor considers whether the key stakeholders provided the services in a coordinated and collaborative manner. *See Michael F.*, 118 F.3d at 253. "The IDEA contemplates a collaborative process between the district and the parents." *E.R. v. Spring Branch Indep. Sch. Dist.*, No. 4:16-cv-0058, 2017 WL 3017282, at *27 (S.D. Tex. June 15, 2017). The child's parents do not, however, possess "veto power" over a school district's decisions, and therefore lack the right to dictate an outcome. *White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003). Absent bad faith exclusion of a student's parents or refusal to listen to them or consider their input, a school district must be deemed to have met the IDEA's requirements regarding collaboration with a student's parents. *See id.*

James F. argues that CCISD wrongfully failed to adopt and implement the conclusions and recommendations of his private expert, Zauner-Undesser. Despite Zauner-Undesser's expertise, CCISD is not required to follow the advice or accept the requests of a parent's expert because "there is no presumption in favor of outside evaluators over teachers or other school personnel." *Lisa M.*, 924 F.3d at 216 (quotation omitted). Rather, the record evinces CCISD's continued collaboration with James F.'s parents at every stage of the process. CCISD coordinated with James F.'s parents and their attorney, and met with them several times from December of 2020 through the spring of 2022 to discuss James F.'s disabilities and accommodations. James F.'s parents attended every ARDC meeting and had, on several occasions, initially agreed with the resulting IEPs.

The ARDC met on December 16, 2020, to develop an IEP for James F. based on his December 2020 FIE and his medical reports. The ARDC included CCISD staff, James F.'s teachers, doctors, specialists, and James F.'s parents. *See* 2 AR 483. Dr. Moore, the eye doctor who diagnosed James F. with CVI, participated in the ARDC meeting via telephone to provide additional information on James F.'s visual system, and suggested he be allowed to take a "10–20 second break" when

14

needed to "reset," which CCISD implemented into his IEP. *Id.* at 480. Additionally, CCISD accepted James F.'s parent's request to consider Zauner-Undesser's report. The ARDC met and reviewed the report on February 17, 2022. *See id.* at 414. Regardless of the resulting IEP, CCISD obviously collaborated with the necessary parties regarding James F.'s disabilities and accommodations.

Although James F.'s parents believe he should have been labeled as a student who is VI and has a specific learning disability in written expression, James F. has failed to present any evidence of bad faith exclusion of his parents by CCISD. *See White*, 343 F.3d at 380 ("Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the [parents]' input, [defendant] met IDEA requirements with respect to parental input."); *Blackmon v. Springfield R–XII Sch. Dist.*, 198 F.3d 648, 656 (8th Cir. 1999) ("Procedural deficiencies in the development of a child's IEP warrant rejecting the IEP only if they compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits." (quotation omitted)). Thus, CCISD has satisfied the IDEA's requirements regarding collaboration with James F.'s parents.

**D.    THE IEP MEANINGFULLY BENEFITED JAMES F.**

The fourth factor considers whether there have been demonstrable academic and non-academic benefits resulting from the IEP. *See Michael F.*, 118 F.3d at 253. The IDEA does not entitle a disabled child to an IEP that maximizes his educational performance, but instead "guarantees a basic floor of opportunity, specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (quotation omitted). "[T]he educational benefit that an IEP is designed to achieve must be meaningful." *Michael F.*, 118 F.3d at 248 (quotation omitted). Specifically, a child in a regular classroom generally requires "an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 580 U.S. at 394 (quotation omitted).

The hearing officer found that James F. obtained sufficient non-academic and academic benefits from his IEP. *See* 1 AR 24. James F. argues, unsuccessfully, that his CVI "is so pervasive in its impact that it necessarily affect[s] all areas of [his] education" and that his "overall academic record is affected by the nature of the case." Dkt. 44 at 15–16. James F. has not provided any evidence to support this claim. On the contrary, the evidence shows that James F.'s overall academic record is nearly stellar with no clear signs of any negative impact from his CVI.

The Supreme Court and the Fifth Circuit "favor an overall academic record-based review." *H.W.*, 32 F.4th at 468. I "must look to [James F.'s] overall academic success, not whether [his] disability has been remedied." *Id.* at 469. James F. continued to meet and surpass his IEP goals, advanced exceptionally in his subjects and standardized testing, and was admitted into the Gifted and Talented program because of his academic merit. *See* 2 AR 583–87, 604–12. In total, it is evident from the record that James F. consistently made progress toward his IEP goals and made overall academic advancement as suggested by his classroom accomplishments and "accelerated" progress on his standardized testing scores. *Id.* at 583, 585.

Regardless of any remaining educational challenges, James F. has failed to carry his burden to show that he did not receive academic or non-academic benefits from his IEP. CCISD need not entirely remediate James F.'s CVI to provide him a FAPE. Because James F.'s IEP adequately enabled him "to achieve passing marks and advance from grade to grade," his IEP was "reasonably calculated to enable [him] to receive educational benefits." *Endrew F.*, 580 U.S. at 394 (quotation omitted).

* * *

Considering the four factors holistically, I find that CCISD developed and implemented a special education program for James F. that was reasonably calculated to provide him with education benefits based on his unique needs.

16

James F. has failed to offer a preponderance of evidence that CCISD denied him a FAPE during the 2021–2022 school year.

## CONCLUSION

Because I find that a preponderance of the evidence supports the hearing officer's decision, I grant CCISD's motion for judgment (Dkt. 39) and deny James F.'s motion (Dkt. 41). A final judgment will issue separately.

SIGNED this __3rd__ day of March 2026.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE